Filed 12/23/14  In re Ariana R. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re ARIANA R., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>ARIANA R.,<br><br>        Defendant and Appellant. | A140248<br><br>(Napa County<br>Super. Ct. No. JV 17395) |

Ariana R. appeals from juvenile court orders continuing her as a ward of the court, on probation in the home of her mother.  She contends the court erred in admitting evidence of a drug test in violation of her constitutional right to confrontation.  She further argues that several of the conditions of probation are constitutionally vague and overbroad, and that the court erred in failing to inform her mother of her right to an evaluation of her ability to pay appellant's legal fees.

We find no error in admission of the drug test evidence.  Several of the conditions of probation must be modified to include a knowledge requirement, and remand is necessary with respect to one of the probation conditions, as well as the order for appellant's mother to reimburse the county for appellant's attorney fees.

1

**STATEMENT OF THE CASE**

On August 26, 2013, a supplemental wardship petition (Welf. & Inst. Code, § 602) was filed charging appellant, then 17 years old, with using and being under the influence of a controlled substance (Health & Saf. Code, § 11550, subd. (a)) and with violating probation (Welf. & Inst. Code, § 777)[1] by violating curfew, being truant, and consuming marijuana. Appellant had previously been declared a ward of the court on May 20, 2013, after admitting a charge of misdemeanor vandalism (Pen. Code, §§ 594, 17), and had been placed on probation in the home of her mother.

On October 4, 2013, after a contested jurisdictional hearing, the court found the allegations of the supplemental petition true.[2] At disposition, on November 4, the court continued appellant as a ward of the court and placed her on probation in her mother's home.

Appellant filed a timely notice of appeal on November 8, 2013.

**STATEMENT OF FACTS**

Appellant's mother reported to the probation department that appellant violated her curfew on August 17 and August 20. After positive results on presumptive drug tests performed by a probation officer, appellant signed forms indicating that she admitted using cocaine and marijuana on July 22 (exhibit 1) and marijuana on August 22 (exhibit 2). The urine samples upon which the drug tests were performed were not retained.

**DISCUSSION**

**I.**

Appellant contends the court's finding that she violated Health and Safety Code section 11550 must be reversed because the evidence supporting this count, exhibit 1, was testimonial evidence and inadmissible under *Melendez-Diaz v. Massachusetts* (2009)

---

[1] Further unspecified statutory codes refer to the Welfare and Institutions Code.

[2] The prosecution withdrew the allegation of truancy after the jurisdictional hearing because there was no evidence to support it.

557 U.S. 305 (*Melendez-Diaz*).[3] Exhibit 1 was a copy of a form entitled "Drug Testing Admissions Form," signed by appellant and dated July 22, 2013, indicating she admitted using cocaine and marijuana.[4]

At the top, immediately under the title, this form states "(For Probation Use Only)." After the heading, "Urine Drug Screen/on-site device preliminary test results," "Step 1" directs the collector to complete the minor's information and provides spaces to be filled in for the minor's name and assigned number and the assigned probation officer's name. "Step 2: Preliminary Test Results" directs the collector to "[p]erform test and log results. Use separate chain of custody label/form to submit presumptive positive specimens to a lab." This section provides space to fill in the date and time of collection and, under the heading "Screening Results Log – not to be interpreted as laboratory result," boxes to be checked to indicate "Presumptive Positive" test results and/or admission of use of specified substances. In "Step 3: Collector Verification," the form states, "[c]ollector completes and validates that the specimen was collected properly," and provides spaces for the collector's name, title and signature, as well as the date, under the statement, "I certify that I collected the specimen provided by the Defendant/Minor named above in accordance with the department policy and procedure and the specimen provided indicated a positive result for the above marked substances." "Step 4: Defendant/Minor Certification" calls for the minor to "complete[] and [validate[] that the specimen was collected properly." Here, the minor's name and signature, and the date, are to be supplied under the statement, "I certify that the specimen provided is my own and was not substituted or adulterated. I admit to testing

---

[3] After sustaining the alleged probation violation in count 2 upon finding that appellant violated her curfew and consumed marijuana on July 22 and August 22, the court initially indicated it was not going to sustain count 1 because there was insufficient evidence to find beyond a reasonable doubt that appellant was under the influence of a controlled substance. When the prosecutor explained that "use" alone was sufficient under Health and Safety Code section 11550, the court changed its ruling and sustained the petition as to count 1 based upon exhibit 1.

[4] Exhibit 2 was a similar form reflecting appellant's August 22 admission that she used marijuana.

positive for and/or using the drug checked in the above section." Finally, the form provides a box to be checked for "Defendant/Minor refused to sign" and "yes" or "no" boxes to be checked for "Specimen sent to lab for GC/MS confirmation."

On Exhibit 1, the boxes for cocaine and marijuana are checked under "Presumptive Positive" and "Admission of Use," with handwritten dates and the initials "A.R." next to the latter boxes. A handwritten note next to the box for opiates under "Presumptive Positive" reads "faint line 'smack.' " The "no" box is checked for "Specimen sent to lab."

Probation Officer Urbach, who performed appellant's drug tests, was unavailable to testify because she was "out of the area training." Supervising Probation Officer Lori Teaf testified that one of her duties as a probation officer was to drug test minors on probation, which was accomplished by means of an "instant test." The minor would provide a urine sample in the test container, under the observation of the probation officer, and initial and sign to confirm the sample was the minor's. The test would be activated by turning the container over, and the results would be indicated by lines on the container that correlate with specific drugs. The results, date and time would be entered in a drug testing log. If the drug test was positive, the minor would be asked if he or she admitted using the substance and, if so, the minor would check a box for "admitted use" and "sign the form stating that they admit to using." The forms were kept in the minor's case file, to which only probation department employees have access. Teaf identified exhibits 1 and 2 as the drug test admission forms used by the probation department and testified that they reflected appellant's admission of cocaine and marijuana use on the July 22 form, and marijuana use on the August 22 form. Teaf did not perform appellant's drug tests.

Appellant argued at the hearing that the exhibit was inadmissible absent testimony by the individual who performed the tests about how they were performed, and moved to dismiss count 1 for lack of evidence because, without the test results, appellant's admissions alone would not satisfy the corpus delicti rule. The prosecutor maintained the exhibits were admissible as official records prepared by a public employee (Evid. Code,

4

§ 1280) and that the notation "For Probation Use Only" demonstrated the form was not prepared for trial but only as a function of monitoring the minor on probation. The juvenile court found the exhibit admissible under Evidence Code section 1280.

Although the exhibit 1 reflects appellant's admission that she used cocaine and marijuana, these admissions alone would not be a sufficient basis for sustaining the petition. "In every criminal trial, the prosecution must prove the corpus delicti, or the body of the crime itself—i.e., the fact of injury, loss, or harm, and the existence of a criminal agency as its cause. In California, it has traditionally been held, the prosecution cannot satisfy this burden by relying *exclusively* upon the extrajudicial statements, confessions, or admissions of the defendant." (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1168-1169.) "The corpus delicti rule requires some evidence that a crime occurred, independent of the defendant's own statements." (*People v. Ledesma* (2006) 39 Cal.4th 641, 721.) Because the trial court's ruling on the admissibility of exhibit 1 implicates appellant's constitutional right to confrontation, we apply the independent standard of review. (See, *People v. Seijas* (2005) 36 Cal.4th 291, 304 [applying independent standard of review to finding that witness could assert privilege against self-incrimination because ruling "affects the constitutional right of confrontation"].)

Under the Confrontation Clause, testimonial statements of a witness who does not testify at trial are admissible only if the witness is unavailable to testify and the defendant had a prior opportunity for cross examination. (*Crawford v. Washington* (2004) 541 U.S. 36, 68 (*Crawford*).) The " 'core class of testimonial statements' " "covered by the Confrontation Clause include" " 'ex parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially; extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions; statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for

use at a later trial.' " (*Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305, 310 (*Melendez-Diaz*), quoting *Crawford*, at pp. 51-52.)

*Melendez-Diaz* held that notarized certificates reporting the results of forensic analysis of material seized by the police were "affidavits" within the "core class of testimonial statements" covered by the Confrontation Clause, because they were made for the sole purpose of establishing that the material was cocaine, the precise testimony the analysts would be expected to provide in live testimony, " ' "under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." ' " (*Melendez-Diaz*, *supra*, 557 U.S. at p. 311, quoting *Crawford, supra*, 541 U.S. at p. 52.) The court rejected the argument that the Confrontation Clause did not apply to testimony concerning the results of " 'neutral scientific testing,' " noting that the methodology used to analyze the substance "requires the exercise of judgment and presents a risk of error that might be explored on cross-examination." (*Melendez-Diaz*, at p. 320.) The court also concluded the certificates were not admissible as business records: "Documents kept in the regular course of business may ordinarily be admitted at trial despite their hearsay status. See Fed. Rule Evid. 803(6). But that is not the case if the regularly conducted business activity is the production of evidence for use at trial." (*Melendez-Diaz*, at p. 321.) In sum, *Melendez-Diaz* held that a forensic laboratory report "created specifically to serve as evidence in a criminal proceeding" is "testimonial" evidence that cannot be introduced without "a live witness competent to testify to the truth of the statements made in the report." (*Bullcoming v. New Mexico* (2011) 564 U.S. ___ [131 S.Ct. 2705, 2709] (*Bullcoming*).)

*Bullcoming*, involving a forensic laboratory report certifying that the defendant's blood alcohol concentration exceeded the threshold for driving while intoxicated, held that the constitutional requirement was not satisfied by "surrogate testimony"—testimony by an analyst who was familiar with the laboratory's procedures but had not performed or observed the test at issue rather than by the analyst who signed the certification. (*Bullcoming*, *supra*, 131 S.Ct. at p. 2708.) *Bullcoming* rejected the view that the analyst who signed the certification merely reported a machine-generated number, explaining

6

that the analysts' statements concerning chain of custody and test protocol followed were "meet for cross-examination." (*Bullcoming*, at p. 2714.) Cross-examination of the certifying analyst could also expose "any lapses or lies" by that analyst, while cross-examination of a surrogate could not. (*Id*. at p. 2715.)

Additionally, while the report was not notarized like the certificates in *Melendez-Diaz*, the "formalities attending the 'report of blood alcohol analysis' " were sufficient to qualify the statements as testimonial: The evidence was provided by law enforcement to a laboratory required by law to assist in police investigations, the analyst who tested the evidence certified the results in a signed document headed a "report," and the report form referred to municipal and magistrate courts' rules providing for admission of certified blood-alcohol analyses. (*Bullcoming, supra*, 131 S.Ct. at p. 2717.)

By contrast, *Williams v. Illinois* (2012) 567 U.S. ___ [132 S.Ct. 2221] (*Williams*) held that expert testimony on the results of DNA testing by a witness who did not perform the underlying tests did not violate the defendant's confrontation rights. In *Williams*, the DNA in semen found on vaginal swabs taken from a rape victim was later matched by a different laboratory to DNA taken from the defendant upon his arrest for an unrelated offense. (*Id.* at p. 2229.) The analyst who testified at trial, from the second laboratory, had not been involved in testing the DNA collected from the rape victim; the defendant challenged her testimony that the profile developed by the first laboratory derived from the victim's swabs. (*Id.* at p. 2230.) The first laboratory's report was not introduced into evidence or directly discussed by the witness. (*Ibid*.)

*Williams* was a fractured opinion: Four justices found no constitutional violation, a fifth agreed with their conclusion but for completely different reasons, and four justices found the defendant's confrontation right was violated by the expert's testimony. The plurality opinion held that the witness properly testified, based on her own expertise, that the two DNA profiles matched, while the challenged testimony that the Maryland profile was derived from the semen on the rape swabs was not offered for its truth but only to explain the assumptions upon which the expert opinion were based. (*Williams, supra,* 132 S.Ct. at p. 2228.) Also, the lab report—and thus the expert's testimony about it—was

7

not testimonial because it "was not prepared for the primary purpose of accusing a targeted individual" (*id*. at p. 2243): The report was not sought to obtain evidence against the defendant, who had not yet been identified as a suspect, but to help find a rapist who was on the loose, and the profile was not inherently inculpatory. (*Id*. at p. 2228.)

Justice Thomas's concurrence was based on the entirely different reasoning that the statements from the Maryland lab "lacked the requisite 'formality and solemnity' to be considered ' "testimonial" ' for purposes of the Confrontation Clause." (*Williams*, *supra*, 132 S.Ct. at p. 2255 (conc. opn. of Thomas, J.).) The report was not sworn or certified, contained no attestation that its statements accurately reflected the testing procedures used or results obtained, and, although produced at the request of law enforcement, was not "the product of any sort of formalized dialogue resembling custodial interrogation." (*Id*. at p. 2260.)

The *Williams* dissenters found the report at issue sufficiently formal to be testimonial, viewing its similarities to the report in *Bullcoming* as "dwarf[ing]" the distinctions: "Each report is an official and signed record of laboratory test results, meant to establish a certain set of facts in legal proceedings. Neither looks any more 'formal' than the other; neither is any more formal than the other. [Citation.]" (*Williams*, at p. 2276 (dis. opn. of Kagan, J.).) To the *Williams* dissenters, the testimony of the expert in that case was "just like the surrogate witness in *Bullcoming*—a person knowing nothing about 'the particular test and testing process,' but vouching for them regardless." (*Williams*, at p. 2270 (dis. opn. of Kagan, J.).)

In a trio of cases applying *Crawford, Melendez-Diaz, Bullcoming* and *Williams*, the California Supreme Court concluded that while the high court has not agreed on a definition of "testimonial," its decisions indicate that two critical components make a statement testimonial. (*People v. Lopez* (2012) 55 Cal.4th 569, 581 (*Lopez*).) First, "to be testimonial the out-of-court statement must have been made with some degree of formality or solemnity." (*Ibid*.) Second, "an out-of-court statement is testimonial only if its primary purpose pertains in some fashion to a criminal prosecution." (*Id*. at p. 582.)

8

The United States Supreme Court justices disagree, however, on what that primary purpose must be: The *Williams* plurality looked for a " 'primary purpose of accusing a targeted individual.' " (*Lopez*, at p. 582, quoting *Williams*, *supra*, 132 S.Ct. at p. 2243); Justice Thomas asked whether the statement was " 'primarily intend[ed] to establish some fact with the understanding that [the] statement may be used in a criminal prosecution' " (*Lopez*, at p. 582, quoting *Williams*, at p. 2261); while the dissenters asked whether the report was prepared " 'for the primary purpose of establishing "past events potentially relevant to later criminal prosecution"—in other words, for the purpose of providing evidence.' " (*Lopez*, at p. 582, quoting *Williams*, at p. 2273.)

In *Lopez*, the trial court admitted a six-page laboratory report. Five pages consisted entirely of data generated by a gas chromatography machine to measure calibrations, quality control and the concentration of alcohol in a blood sample.  These, *Lopez* held, did not implicate the constitutional right to confrontation because "unlike a person, a machine cannot be cross-examined."  (*Lopez*, *supra*, 55 Cal.4th at pp. 582-583.)  The first page of the report, described by the analyst who testified at trial as a " 'chain of custody log sheet,' " contained a chart showing the results of nine blood tests performed by a different analyst, one of which was the defendant's.  (*Id.* at p. 582.)  Certain information on the chart concerning each sample was written by a laboratory assistant, who initialed the page under the heading "logged by."  (*Id.* at p. 583.)  The critical information was the number associated with the defendant's blood sample—this, together with the machine-generated results, allowed the analyst who testified at trial to offer his independent opinion as to the alcohol level in the defendant's blood.  (*Id*. at pp. 583-584.)  *Lopez* held this notation lacked sufficient formality or solemnity to be considered testimonial because neither the analyst nor the laboratory assistant signed, certified, or swore to the truth of the contents and the notation linking the blood sample to the defendant was "nothing more than an informal record of data for internal purposes, as is indicated by the small printed statement near the top of the chart:  'FOR LAB USE ONLY.' "  (*Id*. at p. 584.)

*Lopez* did not consider the primary purpose of the report, but the court addressed that issue in *People v. Dungo* (2012) 55 Cal.4th 608 (*Dungo*), which involved testimony based upon an autopsy report. The report itself was not introduced into evidence and the testifying expert did not discuss the report's conclusions about the cause of death, but described the condition of the body as reflected in the report and autopsy photographs. (*Id.* at pp. 618-619.) Based on the non-testifying pathologist's observations, the expert gave his independent opinion that the cause of death was strangulation. (*Id.* at p. 618.) *Dungo* held that the statements in an autopsy report describing the condition of the body "merely record objective facts" and "are less formal than statements setting forth a pathologist's expert conclusions. They are comparable to observations of objective fact in a report by a physician who, after examining a patient, diagnoses a particular injury or ailment and determines the appropriate treatment. Such observations are not testimonial in nature. (*Melendez-Diaz, supra*, 557 U.S. at p. 312, fn. 2 ['medical reports created for treatment purposes . . . would not be testimonial under our decision today'].)" (*Dungo*, at pp. 619-620, fn. omitted.)

With respect to the primary purpose of the statements in the autopsy report, *Dungo* noted that a primary purpose of criminal investigation was suggested by the facts that a detective was present at the autopsy and told the pathologist about the defendant's confession, and that the autopsy was mandated by a statute requiring public findings and notification of law enforcement. (*Dungo, supra*, 55 Cal.4th at p. 620.) The court held, however, that criminal investigation was only one of several "equally important" purposes for the autopsy's description of the condition of the victim's body, including allowing the decedent's family to determine whether to file an action for wrongful death or an insurance company to determine whether the death is covered under its policy; satisfying the public interest when a death has been reported in local media; and providing answers to grieving family members. (*Id.* at p. 621.) "The autopsy report itself was simply an official explanation of an unusual death, and such official records are ordinarily not testimonial." (*Ibid.*)

10

In a separate concurring opinion, Justice Werdegar stated that the observations in the autopsy report were not testimonial because, although signed, the autopsy report was not sworn or certified and therefore lacked sufficient solemnity and formality; and because the reported observations were not made primarily for use as evidence at trial. (*Dungo, supra,* 55 Cal.4th. at pp. 623-626 (conc. opn. of Werdegar, J.).) On the latter point, Justice Werdegar commented, "a consensus appears to exist that a statement is more testimonial to the extent it was produced under circumstances making it likely to be used in place of live testimony at a future criminal trial. (See *Williams, supra*, 567 U.S. at p. ___ [132 S.Ct. at p. 2243] (plur. opn. of Alito, J.) ['the primary purpose of the Cellmark report, viewed objectively, was not to accuse petitioner or to create evidence for use at trial']; *id.* at p. ___ [132 S.Ct. at p. 2273] (dis. opn. of Kagan, J.) [court has asked 'whether a statement was made for the primary purpose of establishing "past events potentially relevant to later criminal prosecution"—in other words, for the purpose of providing evidence']; *Bullcoming, supra*, 564 U.S. at p. ___ [131 S.Ct. at p. 2717] ['A document created solely for an "evidentiary purpose" . . . made in aid of a police investigation, ranks as testimonial.']; [*Michigan v.*] *Bryant* [(2011)] 562 U.S. at p. ___ [131 S.Ct. 1143, 1155] [confrontation clause not implicated when 'a statement is not procured with a primary purpose of creating an out-of-court substitute for trial testimony']; *Melendez-Diaz, supra*, 557 U.S. at p. 311 [observing that 'under Massachusetts law the *sole purpose* of the affidavits was to provide "prima facie evidence of the composition, quality, and the net weight" of the analyzed substance']; *Davis* [*v. Washington* (2006)] 547 U.S. 813, 830 [statements made under formal police interrogation are 'an obvious substitute for live testimony'].)" (*Dungo, supra,* 55 Cal.4th at pp. 624-625 (conc. opn. of Werdegar, J.).)

Most recently, in *People v. Banks* (2014) 59 Cal.4th 1113 (*Banks*), our Supreme Court set out "a few rules" that have emerged from its cases. "First, the introduction of machine-generated data does not implicate the confrontation clause because 'unlike a person, a machine cannot be cross-examined . . . .' ([*Lopez, supra,*] 55 Cal.4th [at p. 583].) Second, an expert witness's reliance on statements or reports by other individuals

11

that 'merely record objective facts' do not implicate the confrontation clause because "[s]uch observations are not testimonial in nature.' ([*Dungo, supra,*] 55 Cal.4th [at p. 619]) [holding that a pathologist's 'statements describing . . . anatomical and physiological observations about the condition' of a body upon which an autopsy was being performed were not testimonial].)  Finally, we have held that a lab technician's act of initialing a report describing actions he or she has taken with respect to a particular lab test is insufficient to convert that report into a testimonial statement because initialing lacks the requisite formality, absent (at the least) a signature, certification, or other form of swearing to the truth.  (*Lopez*, at pp. 584–585.)" (*Banks*, at p. 1168.)

*Banks* addressed testimony by a laboratory director about the results of DNA testing performed by analysts at her laboratory.  (*Banks, supra,* 59 Cal.4th at p. 1166.)  The witness reviewed x-ray films of the DNA results generated by the analysts and independently concluded that the defendant's DNA matched that of the victim's assailant; she also testified that her conclusions were in accord with those of the analysts who prepared the x-ray films.  (*Id.* at p. 1167.)  The x-ray films were not in evidence and there was no suggestion they were formally attested to by the analysts.  (*Id.* at p. 1168.)  *Banks* referred to the expert's testimony concerning the opinions of the other analysts as "constitutionally dubious" but found any error in this regard was harmless because she testified to her own independent conclusion based on "objective scientific data"—the x-ray film.  (*Ibid.*)

Under the authorities discussed above, we conclude the evidence at issue in the present case was not testimonial because it was not produced for the "primary purpose" of creating evidence for use in a criminal prosecution.  Appellant contends that the primary purpose of drug testing minors on probation is "bringing a minor's drug use to the attention of the juvenile court so it can intervene," which "necessarily involves the potential for bringing a probation violation action against the minor, if not, as in this case, the filing of a wardship petition."  As appellant maintains, the legislative history of Penal Code section 729.3, which specifically authorizes drug testing for minors on probation, emphasizes the need for early intervention to address the problem of juvenile

12

delinquency.  (*In re P.A.* (2012) 211 Cal.App.4th 23, 37-38.)  But the Legislature's declaration of intent reflects a focus on deterrence and rehabilitation, undermining appellant's conclusion that the "primary purpose" of the probation department's drug tests here was "to potentially provide evidence for further legal action against [appellant]."

The declaration of intent states that the " 'problem of juvenile delinquency should be addressed at its inception rather than after it has progressed to serious criminality," the "precursors of serious criminality by juveniles include incorrigibility, truancy, curfew, illiteracy, and alcohol and drug abuse,' " and " '[t]he young offender who exhibits the symptoms of future delinquency presents the most significant potential for rehabilitation . . . .' " (*In re P.A., supra,* 211 Cal.App.4th at pp. 36-37, quoting Stats. 1989, ch. 1117, § 1, p. 4113.)  The Legislature intended " 'to implement a program based on a different perspective and strategy toward juvenile delinquency which program is designed to reach our children before they become habitual criminals, and requires the intervention by the juvenile justice system at the earliest signs of drug abuse, gang affiliation, and other antisocial behavior.  The program mandates parental involvement, drug and alcohol counseling, structured probation programs monitored for compliance, and early judicial intervention with delinquent youths.  It seeks to promote the positive development of juveniles by emphasizing the enforcement of school attendance laws and the establishment of special education and socialization programs designed for the individual needs of the minor.' " (*In re P.A.*, at p. 37.)  Section 729.3 "protects the public by establishing procedures to deter or prevent use of alcohol and unlawful drugs by minors" and "advances the rehabilitation of young offenders by seeking to detect alcohol or drug use as a precursor of criminal activity in order to facilitate intervention at the earliest time." (*In re Kacy S*. (1998) 68 Cal.App.4th 704, 711.)

The probation department conducted drug tests as part of its obligation to monitor appellant's performance on probation.  In *Melendez-Diaz* and *Bullcoming*, laboratory tests were performed to establish that a specific suspected offense had been committed— in the former, that the substance the defendant was suspected of trafficking was in fact

13

cocaine, in the latter that the defendant's blood alcohol level was above the threshold for the charged offense.  Here, by contrast, appellant was tested as part of a routine monitoring practice employed for purposes including deterrence and rehabilitation— purposes equally, if not more, important than further prosecution.  (See, *Dungo, supra,* 55 Cal.4th at p. 621.)  Moreover, as Teaf testified, upon a positive result on the presumptive test, a minor is asked to admit use of the substance, as appellant did here.  In this situation, if the positive test leads to prosecution of a probation violation or new petition, the case goes forward not on the test evidence alone but on the minor's signed admission. This procedure underscores that the primary purpose of documenting the test result is not to produce direct evidence for use in court.

The form itself indicates that its purpose is internal departmental documentation rather than production of evidence.  As set forth above, the "steps" described on the form are directions on the procedure for collecting a urine sample and documenting test results. The form states that it is "for probation use only," the test results reflected on the form are described as "preliminary" and "Presumptive Positive," the "Screening Results Log" states that it is "not to be interpreted as laboratory result," and the form provides a place to indicate whether the specimen was sent to a lab for confirmation.  The collector's certification states only that the specimen was collected from the minor "in accordance with the department policy and procedure" and that the specimen "indicated a positive result"; it does not attest to the accuracy of the testing method or result obtained.  All these provisions indicate that the form was not intended primarily to serve as a substitute for trial testimony establishing the minor's drug use but as a means of contemporaneously recording *preliminary* drug tests results—subject to laboratory confirmation—and, when possible, minors' admissions based on those results, for the purpose of monitoring minors' compliance with the terms of probation.

## II.

Appellant seeks modification of the following four conditions of probation imposed by the juvenile court, arguing that they are unconstitutional as written:

14

"11.  The minor not use or possess any alcohol, marijuana, synthetic cannabinoids, or other illegal drugs during the period of wardship . . .; [¶] . . .[¶]

"14. The minor shall not possess any ammunition, explosive, weapon or replica of a weapon;

"15. The minor cannot possess anything used to create graffiti . . . [¶] . . .[¶]

"19.  The minor must stay at least 100 yards away from all schools during school hours unless enrolled in that school, or for an activity approved by the Probation Officer."

Appellant maintains that all four of these conditions are unconstitutionally vague because they lack a requirement that she *know* she is violating the condition. Additionally, she contends condition 14 is vague and overbroad in that it does not sufficiently describe what type of weapons are prohibited, and condition 19 unconstitutionally restricts her right to travel and is not tailored to her individual needs for rehabilitation.  She proposes the following modifications:

"11. The minor not to *knowingly* use or possess any alcohol, marijuana, synthetic cannabinoids or other illegal drugs during the period of wardship . . . ."

"14. The minor shall not *knowingly* possess any ammunition, explosive, *dangerous or deadly* weapon, or replica of a *dangerous or deadly* weapon."

"15. The minor cannot *knowingly* possess anything used to create graffiti."

"19.  The minor is not to *knowingly* be on or within *50 feet* of any school campus during school hours unless enrolled in that school, or for an activity approved by the Probation Officer."

Respondent agrees to modification of all four conditions to include an express knowledge requirement, as well as modification of condition 14 to refer to "dangerous or deadly" weapons, but objects to the reduction of the distance specified in condition 19.

Section 730, subdivision (b), authorizes the juvenile court to "impose and require any and all reasonable conditions that it may determine fitting and proper to the end that justice may be done and the reformation and rehabilitation of the ward enhanced."  The conditions "may infringe on constitutional rights" if they are tailored to meet the minor's

15

needs.  (*In re R.V.* (2009) 171 Cal.App.4th 239, 248; *In re Sheena K.* (2007) 40 Cal.4th 875, 889.)

A challenge to a probation condition as facially vague and overbroad presents "a pure question of law, easily remediable on appeal by modification of the condition," and may be reviewed on appeal even if not raised in the court below.  (*In re Sheena K., supra,* 40 Cal.4th at pp. 888-889.)  We review such constitutional challenges de novo.  (*In re Shaun R.* (2010) 188 Cal.App.4th 1129, 1143.)  Ordinarily, probation conditions are reviewed for abuse of discretion.  (*Ibid*.)

Respondents' concessions are appropriate.  With respect to the express knowledge requirement, as presently worded, appellant could violate these probation conditions unknowingly, for example, by borrowing a car which, unknown to her, holds the owner's lawfully obtained gun in the trunk (*People v. Freitas* (2009) 179 Cal.App.4th 747, 752), or by walking within 100 yards of a school she was not aware was in that location.  An express knowledge requirement is necessary.  (*In re Victor L.* (2010) 182 Cal.App.4th 902, 911-912.)  Modification of condition 14 to add the descriptor "dangerous or deadly" will provide sufficiently precise notice of the proscribed conduct.  (*In re R.P.* (2009) 176 Cal.App.4th 562, 567-568.)

Turning to condition 19, respondent has not addressed appellant's contention that prohibiting her from being within 100 yards of any school in which she is not enrolled, or does not have her probation officer's permission to visit, unconstitutionally restricts her right to travel and is not tailored to her individual needs.  Appellant's proposed modification, however, accepts the basic condition, altered only to add a knowledge requirement and reduce the geographic range of the prohibition.  Accordingly, the only point requiring consideration is the distance specified in this condition.

Appellant's argument is that there are so many schools in the San Francisco Bay Area, and 100 yards is such a large distance, that the condition effectively banishes her from many commercial and residential areas.  She relies upon *People v. Barajas* (2011) 198 Cal.App.4th 748 (*Barajas*), which modified a condition prohibiting the probationer from being "adjacent" to a school campus to specify a proscribed distance of 50 feet.

16

*Barajas* modified the condition by specifying a specific distance because of the imprecision inherent in the term "adjacent." (*Id.* at p. 761.) The court chose 50 feet not to set a "constitutional threshold" but because the Attorney General had proposed modifying the condition to specify this distance. (*Id.* at p. 761 & fn. 10.)

*In re D.G.* (2010) 187 Cal.App.4th 47 held that a condition prohibiting the minor from being within 150 feet of a campus other than the school he was enrolled in was unreasonable because his offenses were not related to schools, but modified the condition to prohibit him from being on school grounds unless accompanied by a responsible adult or authorized by school authorities. (*Id.* at pp. 53, 57.) The court explained that the prohibition related to school grounds was informed by Penal Code section 627.6, making it a misdemeanor to be on school grounds without registering with the principal, while there was no basis for the prohibition on being *near* school grounds. (*In re D.G.*, at pp. 53-56.) Concurring in the result, Justice Marchiano stated that nothing in the record explained why the juvenile court had imposed the 150-foot stay-away distance, and that he would have supported the requirement if the reason for its imposition had been explained adequately. (*Id.* at pp. 57, 59.)

Nothing in the record in the present case explains the choice of a 100-yard distance in the school condition. This distance is significantly greater than that in *Barajas* or even *In re D.G.*; it would prohibit appellant from visiting a residence or business, or even driving or walking, in an area nearly the length of a football field[5] around *any* school campus. Especially in an urban or suburban area, this condition clearly imposes a significant burden on appellant's constitutional right to travel. " 'A probation condition that imposes limitations on a person's constitutional rights must closely tailor those limitations to the purpose of the condition to avoid being invalidated as unconstitutionally overbroad.' " (*Barajas, supra,* 198 Cal.App.4th at p. 753, quoting

---

[5] A football field is 360 feet long and 160 feet wide (<http://www.nfl.com/rulebook/field>).

*In re Sheena K., supra,* 40 Cal.4th at p. 890; *In re Babak S.* (1993) 18 Cal.App.4th 1077, 1084.)

We decline to accept appellant's suggestion to modify the condition to specify a distance of 50 feet, as was done in *Barajas.* The choice of that distance would be completely arbitrary, as nothing in the record provides a basis for choosing any particular distance. As a constitutional matter, as *Barajas* noted, "a different measure of distance (e.g., '30 feet,' '20 yards'), a different measure of physical proximity (e.g., 'on' or 'one block away') or otherwise mapping restricted areas (e.g., 'the 1200 block of Main Street')" might be equally permissible. (*Barajas*, *supra*, 198 Cal.App.4th at p. 762.) We believe it more appropriate to remand for the juvenile court to determine how this condition would best be tailored to appellant—and explain its decision.

**III.**

At the dispositional hearing, the court ordered appellant's mother to reimburse Napa County for $900 in legal costs. Appellant contends that the court erred in failing to inform her mother she had a right to have her ability to pay evaluated pursuant to Section 903.45, that her constitutional right to due process was denied by this failure, and that the order must be made subject to an evaluation of ability to pay.

Section 903.1 provides that "the father, mother, spouse, or other person liable for the support of a minor, the estate of that person, and the estate of the minor, shall be liable for the cost to the county or the court, whichever entity incurred the expenses, of legal services rendered to the minor by an attorney pursuant to an order of the juvenile court." Section 903.45, subdivision (b), directs the juvenile court, at the close of the disposition hearing, to "order any person liable for . . . the cost of legal services as provided for in Section 903.1 . . . to appear before the county financial evaluation officer for a financial evaluation of his or her ability to pay those costs." If the financial evaluation officer determines that the responsible person has the ability to pay all or part of the costs, the officer "shall petition the court for an order requiring the person to pay that sum to the county or court, depending on which entity incurred the expense." (§ 903.45, subd. (b).) If the parent or guardian has been reunified with the child pursuant

to court order and the financial evaluation officer determines that "repayment of the costs would harm the ability of the parent or guardian to support the child," the officer "shall not petition the court for an order of repayment, and the court shall not make that order." (*Ibid.*) If the person fails to appear before the financial evaluation officer after having been ordered to do so and has been given "proper notice," the officer "shall recommend to the court that the person be ordered to pay the full amount of the costs." (*Ibid.*) "Proper notice" must include "[t]hat the person has a right to a statement of the costs as soon as it is available"; "[t]he person's procedural rights under Section 27755 of the Government Code [pertaining to hearings on ability to pay court-related costs]"; [t]he time limit within which the person's appearance is required"; and a "warning that if the person fails to appear before the county financial evaluation officer, the officer will recommend that the court order the person to pay the costs in full." (§ 903.45, subd. (b).)

Respondent maintains that appellant lacks standing to assert her mother's right's regarding the financial obligation. "A party has standing to seek review of a judgment or order by demonstrating that the party is legally aggrieved within the meaning of Code of Civil Procedure section 902. (*Crook v. Contreras* (2002) 95 Cal.App.4th 1194, 1201; *Bratcher v. Buckner* (2001) 90 Cal.App.4th 1177, 1184.) " 'One is considered, "aggrieved" whose rights or interests are injuriously affected by the judgment. [Citations.] Appellant's interest " 'must be immediate, pecuniary, and substantial and not nominal or a remote consequence of the judgment.' " [Citation.]' (*County of Alameda v. Carleson* (1971) 5 Cal.3d 730, 737; accord, *United Investors Life Ins. Co. v. Waddell & Reed, Inc*. (2005) 125 Cal.App.4th 1300, 1304–1305.). . . 'The purpose of a standing requirement is to ensure that the courts will decide only actual controversies between parties with a sufficient interest in the subject matter of the dispute to press their case with vigor. [Citations.]' (*Common Cause v. Board of Supervisors* (1989) 49 Cal.3d 432, 439; see *Holmes v. California Nat. Guard* (2001) 90 Cal.App.4th 297, 314–315.)" (*In re Jasmine S*. (2007) 153 Cal.App.4th 835, 841-842.)

Appellant maintains that she was aggrieved by the order for her mother to pay $900 in legal costs, without evaluation of her ability to pay, because of the impact of that

order on her family's finances. The record indicates that appellant's mother, who spoke with the probation officer with the assistance of a Spanish language interpreter, had a secondary school education, worked in "event service" at the Silver Oak Winery and supported appellant. Appellant's father was deceased, her adult brother also lived with the mother, and her adult sister was married and lived independently.

Respondent views appellant's asserted interest as " 'nominal' " and a " 'remote consequence of the ruling' " that does not establish an " 'immediate and substantial interest which is injuriously affected by the court's decision.' " (*In re Holly B.* (2009) 172 Cal.App.4th 1261, 1265.) *Holly B.* found that the father in a dependency case lacked standing to challenge the court's granting of the Department's petition for modification to rescind an order for a psychological evaluation of the child. (*Id.* at p. 1266.) The evaluation had been ordered to help determine the proper level of placement for the child, who was in long term foster care, and the selection of a specific placement did not "directly affect any legally cognizable interest personal to" the father. (*Id.* at p. 1265.) Similarly, the other cases respondent relies upon involve parties in dependency cases attempting to raise issues that did not affect their own personal interests.[6] Here, by

---

[6] *In re D.M.* (2012) 205 Cal.App.4th 283, held that a brother did not have standing to challenge a judgment terminating parental rights over his younger half siblings and selecting adoption as their permanent plan; he was aggrieved by the court's finding the sibling exception to the statutory preference for adoption inapplicable, but he had no cognizable interest in the general finding of adoptability. (*Id.* at pp. 286-287, 294.) *In re D.S.* (2007) 156 Cal.App.4th 671, 673-674, found that a father lacked standing to challenge the denial of the mother's petition for modification, which pertained to the mother's reunification services and visitation, and in which the father had not joined. *In re Frank L.* (2000) 81 Cal.App.4th 700, 701, 703, held that a mother of a child placed in long term foster care with a relative in another state did not have standing to challenge the placement order on the basis that the child should not be separated from his siblings or to raise a claim that the child received ineffective assistance of counsel.

The other standing cases respondent cites are no more illuminating. *In re Joseph* (2000) 83 Cal.App.4th 712, 715-716, held that an alleged father who had taken no steps to become a party of record in the dependency proceeding lacked standing to appeal the order terminating parental rights of the "unknown father." *In re Jasmine S.*, *supra*, 153 Cal.App.4th at page 842, found that an organization contractually obligated to provide

20

contrast, at the time the court ordered appellant's mother to pay the legal costs, appellant was a minor dependent upon her mother for support. It is obvious that if the mother's resources were in fact limited, the court's order would have a direct impact on appellant. Respondent asserts that appellant was almost 18 years old at disposition and capable of working to support herself, but this does not negate her direct interest in the family finances at the time the order was made.

Respondent also argues that there was no violation of appellant's or her mother's due process rights because appellant's mother received sufficient notice of her financial obligations. Respondent points to various documents that referred to parents' financial obligations in general or to the parent's obligations in this case in particular. The original petition contained a notice "TO PARENTS OR OTHERS LEGALLY RESPONSIBLE FOR THE SUPPORT OF THE CHILD" stating, "You and the estate of your child may be jointly and severally liable for the cost of the care, support, and maintenance of your child in any placement or detention facility, the cost of legal services for your child or you by a public defender or other attorney . . . ." The subsequent notice of hearing sent to appellant's mother on March 14, 2013, stated that appellant was "required to have an attorney present to represent" her at all hearings on the petition unless the court ordered otherwise, that if she was unable to afford an attorney, the court would appoint the public defender, and that the "parent/guardian will be required to reimburse the county of Napa for the services of any appointed attorney, if they have the ability to do so." This notice also stated that the parent is entitled to have an attorney present at all hearings on the petition and directed a parent who wanted representation but was unable to afford an attorney to contact the Napa Bar Association or Legal Aid. The May 2, 2013, assessment, which appellant and her mother signed, included the probation officer's recommendation that appellant's parent "be required to reimburse the County for all costs

legal representation to litigants in dependency cases did have standing to challenge the disqualification of one of its units even though the children the unit represented, and the unit itself, did not appeal the disqualification order, because the organization's contractual obligations gave it "an immediate and concrete stake" in the litigation. (*Ibid*.)

21

incurred, in an amount and manner to be determined. The minor's parent(s), if requested to do so, shall appear before the Financial Hearing Officer." Appellant's mother was not present at the May 20 disposition hearing, when the court ordered "that [appellant's] legal guardian . . . reimburse the County of Napa for all costs," but the court's order of May 20, 2013, included the provision recommended by the probation officer.

The supplemental petition filed on August 26 contained the same notice regarding legal fees as the original petition, and the disposition report included the probation officer's recommendation that appellant's parent be required to reimburse the county "for legal costs incurred, including $900, in an amount and manner to be determined. The minor's parent(s), if requested to do so, shall appear before the Financial Hearing Officer." Appellant's mother was present at the disposition hearing on November 4, where the court stated, "I'll order that [appellant's] mother . . . [r]eimburse the county of Napa for $900 in legal costs and up to $25.36 per day for [appellant's] stay in Juvenile Hall." There was no objection to this order. The court's order after hearing states, "The minor's parent(s) or legal guardian shall [¶] . . .[¶] be required to reimburse the County of Napa for legal costs incurred, including $900, in an amount and manner to be determined.

It thus appears that appellant's mother was given notice that she would be obliged to pay the cost of appellant's legal representation *if she had the ability to do so*; that the first mention of a specific dollar amount was in the disposition report for the supplemental petition; and that the court's orders stated a requirement for the parent(s) to appear before the Financial Hearing Officer *if requested to do so*. But it does not appear that appellant's mother was ever informed how her ability to pay would be determined or requested to appear before the financial hearing officer. Nor does it appear she was told she had any need for or right to representation by an attorney with respect to her financial obligations or warned that a failure to object would permit the court to order payment without any determination of her ability to pay.

Respondent argues that any due process claim was forfeited by appellant's mother's failure to raise the issue in the juvenile court, noting that she never requested a hearing or appointment of an attorney to dispute the legal fees. Having concluded

22

appellant has standing to raise the issue, we need not consider the question of forfeiture by appellant's mother. We must determine, however, whether appellant's own failure to object waived the issue.

In *People v. McCullough* (2013) 56 Cal.4th 589, 598 (*McCullough*), the California Supreme Court held that failure to object in the trial court to imposition of a booking fee forfeited a claim that the evidence was insufficient to support the statutorily required finding of ability to pay. The defendant's ability to pay presented a factual issue, not a legal one that could be " 'resolved without reference to the particular sentencing record developed in the trial court.' " (*Id.* at pp. 594, 597.) Additionally, the court noted that unlike the booking fee statute, many other statutes requiring a determination of ability to pay provide procedural requirements or guidelines, indicating that "the Legislature considers the financial burden of the booking fee to be de minimis and has interposed no procedural safeguards or guidelines for its imposition. In this context, the rationale for forfeiture is particularly strong." (*Id.* at pp. 598-599.)

Section 903.45, subdivision (b), is one of the statutes mentioned in this part of *McCullough*, cited for its list of "qualifying court-related costs" subject to statutory procedural requirements. (*McCullough, supra,* 56 Cal.4th at p. 598.) Section 903.45, subdivision (b), includes a number of procedural requirements, as described above. The court is required to "order" a parent liable for legal fees under section 903.1 to appear before the county financial evaluation officer for evaluation of ability to pay. Upon finding the parent able to pay part or all of the costs, the financial officer is required to petition the court for an order requiring payment, but if the parent has reunified with the child pursuant to court order and the financial officer determines that repayment of the costs would harm the parent's ability to support the child, the financial officer must not seek, and the court must not order, repayment. The statute sets out factors to be considered in evaluating ability to pay and requires the financial officer to advise the parent of his or her right to a hearing by the court to dispute the officer's determination. A hearing is required if the financial officer and parent cannot reach agreement on liability, amount, ability to pay, or terms of payment.

Applying the *McCullough* court's reasoning, the procedural requirements of section 903.45, subdivision (b), suggest the Legislature does *not* consider the financial burden of paying attorneys fees to be de minimus and counsels *against* forfeiture. In other words, these provisions indicate that the Legislature considered the fees significant enough that they should not be imposed absent specified procedural safeguards. This is not to say, however, that challenges to fees assessed under statutes containing procedural protections are necessarily *not* forfeited by failure to object; *McCullough* simply said that "the rationale for forfeiture [was] particularly strong" in the context of a statute that did *not* provide such protections. (*McCullough, supra,* 56 Cal.4th at p. 599.) The *McCullough* court's earlier discussion indicates that the issue of sufficiency of the evidence of ability to pay is subject to forfeiture, in any event, because it requires a factual determination. (*Id.* at pp. 594-597.)[7]

The issue here, however, is the court's failure to follow any of the statutory requirements for imposition of the fee: The court did not order appellant's mother to appear before the financial evaluation officer at the close of the disposition hearing as required by section 903.45, subdivision (b), but simply imposed the fee. The probation officer's reports contain nothing to suggest any consideration was given to the mother's ability to pay, nor anything to suggest the amount recommended is anything other than the actual amount expended. Forfeiture of sentencing claims for failure to object in the trial court is reasonable, in large measure, because of attorneys' obligations to understand the relevant rules and advocate for their proper application. (See, *People v. Scott* (1994) 9 Cal.4th 331, 353 [although trial court "is required to impose sentence in a lawful manner, counsel is charged with understanding, advocating, and clarifying permissible sentencing choices at the hearing"].) Here, appellant was represented by counsel and, as

---

[7] The question whether failure to object forfeits objection to imposition of a probation supervision fee (Pen. Code, § 1203.1b) without determination ability to pay is currently pending before the California Supreme Court in *People v. Aguilar* (2013) 219 Cal.App.4th 1094 (review granted Nov. 26, 2013, S213571); *People v. Trujillo* (review granted Nov. 26, 2013, S213687).

we have said, her interest in her mother's financial situation is sufficient to give her standing to maintain the current challenge. But it is obvious, as a practical matter, that the focus of appellant's attorney in the juvenile court would have been on the conditions of probation addressed to appellant herself rather than those addressed to her mother. To excuse the court's failure to follow any of the procedural requirements for imposition of the fee under section 903.45 due to appellant's failure to object, in these circumstances, would thoroughly undermine the protections the Legislature sought to ensure for a person subjected to liability.

The order for reimbursement of attorney fees shall be reversed and the matter remanded to the juvenile court for reconsideration of this fee after proper compliance with section 903.45.

## DISPOSITION

Probation conditions Nos. 11, 14, and 15 shall be modified to add the italicized language indicated below:

"11. The minor not to *knowingly* use or possess any alcohol, marijuana, synthetic cannabinoids or other illegal drugs during the period of wardship . . . ."

"14. The minor shall not *knowingly* possess any ammunition, explosive, *dangerous or deadly* weapon, or replica of a *dangerous or deadly* weapon."

"15. The minor cannot *knowingly* possess anything used to create graffiti."

The matter is remanded to the juvenile court to reconsider the distance specified in probation condition No. 19. Any restriction imposed shall include a knowledge requirement.

The order for reimbursement of legal fees to the County of Napa is reversed. On remand, the juvenile court shall reconsider the reimbursement order after proper compliance with section 903.45.

In all other respects, the orders are affirmed.

                                                      _____

                                                      Kline, P.J.

We concur:

_____

Richman, J.

_____

Stewart, J.